******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* RAMON A. G.*
(AC 39704)

Keller, Elgo and Moll, Js.

*Syllabus*

Convicted of the crimes of assault in the third degree and criminal violation of a protective order in connection with an incident in which the defendant assaulted the victim, the defendant appealed to this court. *Held*:

1. The defendant could not prevail on his claim that the trial court violated his constitutional rights to due process and to present a defense by improperly declining to give a jury instruction on the defense of personal property with respect to the assault charge against him: the claim of instructional error was not properly preserved for appellate review, as neither the defendant's written request to charge nor anything else in the record indicated that the defendant ever alerted the trial court to the distinct instructional deficiency claimed on appeal; moreover, the doctrine of implied waiver precluded substantive consideration of the defendant's claim of instructional impropriety, as the record revealed that the defendant was provided with a meaningful opportunity to review the trial court's initial draft charge that the court provided during an in-chambers conference, the revised draft charge that the court sent to the parties later that night and the final draft charge that the court provided prior to the parties' closing arguments, that the court solicited and received comments from the parties over the course of multiple charge conferences, that the defendant thereafter expressed satisfaction with both the draft charge and the ultimate charge that the court delivered to the jury and that at no time at trial did the defendant voice any objection regarding the instructional deficiency he alleged on appeal.

2. The prosecutor's improper comment that certain cell phone records that were not in evidence probably would have helped the state's case did not deprive the defendant of a fair trial, as it did not so infect the trial with unfairness that the defendant's resulting conviction amounted to a denial of due process; the prosecutorial impropriety consisted of a single, isolated, inadvertent comment during rebuttal argument that was not particularly severe, the comment was not central to the critical issues in the case, as the existence of the cell phone records had little bearing on the question of whether the defendant perpetrated the charged offenses, the comment was invited by the defendant's testimony that suggested that the cell phone records would have corroborated his trial testimony, the state's case against the defendant was strong with respect to the crimes of which he was convicted, and the trial court gave the jury a curative instruction that it should not consider the prosecutor's improper comment because it was not supported by evidence in the record.

Argued January 10—officially released June 11, 2019

*Procedural History*

Substitute information charging the defendant with the crimes of robbery in the first degree, assault in the second degree and criminal violation of a protective order, brought to the Superior Court in the judicial district of New Britain and tried to the jury before *Keegan, J.*; verdict and judgment of guilty of the lesser included offense of assault in the third degree and of criminal violation of a protective order, from which the defendant appealed to this court. *Affirmed.*

*Jennifer B. Smith*, for the appellant (defendant).

*James M. Ralls*, assistant state's attorney, with whom, on the brief, were *Brian Preleski*, state's attor-

ney, and *Elizabeth Moseley*, senior assistant state's attorney, for the appellee (state).

*Opinion*

ELGO, J. The defendant, Ramon A. G., appeals from the judgment of conviction, rendered after a jury trial, of assault in the third degree in violation of General Statutes § 53a-61 and criminal violation of a protective order in violation of General Statutes § 53a-223 (a). On appeal, the defendant claims that (1) the trial court improperly declined to furnish a jury instruction on the defense of personal property with respect to the assault charge and (2) prosecutorial impropriety during closing argument deprived him of his due process right to a fair trial. We affirm the judgment of the trial court.

On the basis of the evidence adduced at trial, the jury reasonably could have found the following facts. In August, 2012, the victim began what she described at trial as a "toxic relationship" with the defendant, which lasted seven months and concluded in March, 2013. On March 18, 2013, a protective order was issued that prohibited the defendant from having any contact with the victim.

At approximately nine o'clock on the evening of March 22, 2013, the victim received a text message from the defendant indicating that he wanted to meet with her.[1] Although initially hesitant, she ultimately agreed to do so and began walking toward the apartment where the defendant resided with his mother, who at that time was hospitalized. The defendant then picked the victim up in a motor vehicle and continued to the apartment, where they socialized with other individuals. When some attendees became rowdy, the victim decided to leave. As she exited the apartment, the victim took the keys to a vehicle belonging to the defendant's mother and began to walk home.

Halfway to her home, the victim "felt like something bad was going to happen," so she tossed the keys into a bush alongside the road, which she described at trial as "[s]omewhere safe where I could go back for them later." At that time, she was wearing a backpack that contained, among other things, her cell phone, a money order, and cash. Soon thereafter, a vehicle driven by an unidentified person stopped in the middle of the street. The defendant exited the vehicle and started yelling "[w]here's the keys" in an angry manner. The defendant then grabbed the victim's backpack and swung her around. With her backpack still on, the victim fell to the ground, and the defendant began kicking her in the head, back, and stomach. After one particular blow to her temple area, the victim saw "stars" and let go of the backpack. The defendant rummaged through its contents, returned to the vehicle with the backpack in hand, and departed.

Martin Martinez was inside his nearby residence at the time of the altercation. When he looked outside, he saw a man kicking a woman on the ground. As he

testified: "I . . . remember seeing a male beating up a female . . . . I saw some kicking. I saw her on the ground, and I saw someone—the male, you know, really giving it to her, stomping on her." Martinez immediately called 911 to report the incident.[2]

Officer Marcus Burrus of the New Britain Police Department arrived at the scene to find the victim crying, shaking, and hunched on the ground. The victim "was bleeding from areas of her face. She had blood on her ears, her face, [and] her hands." While awaiting medical assistance for the victim, Burrus answered an incoming call to her cell phone from a contact labeled "Maria." On the basis of prior experience and conversations with the defendant,[3] Burrus recognized the caller as the defendant. During that conversation, Burrus testified that the defendant "told [him] that he came to the area [where the altercation transpired] and that he had confronted [the victim] because he believed that she was in possession of his mother's keys. And [the defendant] stated that he didn't touch her, but that he was there and that he just was going to find and borrow his mother's keys."

The victim was transported by ambulance to a nearby hospital, where she received medical treatment. Photographs of injuries to her face, neck, hands, and back were taken while she was hospitalized and were admitted into evidence at trial.

The victim was released from the hospital on the morning of March 23, 2013. Although a protective order remained in place, the victim received multiple text messages from the defendant later that morning. In those messages, the defendant indicated that he wanted to exchange the victim's backpack for the keys to his mother's vehicle. The victim, however, did not want to meet with the defendant. The defendant's cousin later returned the backpack to her with its contents secure.

Burrus met with the victim at her home the following day. At that time, the victim informed him that she had received text messages from the defendant, which Burrus reviewed on her phone.[4] At trial, Burrus testified that one such message contained "something along the lines of I ain't done with you yet."

The defendant testified at trial on his own behalf and provided a different account of the altercation. In his testimony, the defendant admitted that he had confronted the victim on the sidewalk as she was walking home that night. He testified that he "said please give me my mother's keys" and that the victim then "began to swing at [him]." The defendant testified that, as he grabbed her hands and "told her, please, just give me the keys," he slipped and fell to the ground, which he attributed to wintry weather conditions. The defendant further testified that, as he attempted to "get up to leave," the victim "grabbed a hold of [his] foot," causing

him to again fall to the ground. The defendant testified that "I just shook my foot loose and I crossed the street and I got in the car and we left."

Following that altercation, the defendant was arrested and charged with robbery in the first degree in violation of General Statutes § 53a-134 (a) (3), assault in the second degree in violation of General Statutes § 53a-60 (a) (2), and criminal violation of a protective order in violation of § 53a-223 (a). Pursuant to General Statutes § 53a-40b, the state also charged, in a part B information, that the defendant committed those offenses while on release "pursuant to [General Statutes] §§ 54-63a to 54-63g and/or [General Statutes] §§ 54-64a to 54-64c . . . ." A trial followed, at the conclusion of which the jury found the defendant not guilty of robbery in the first degree and assault in the second degree. The jury found the defendant guilty of criminal violation of a protective order and the lesser included offense of assault in the third degree. The defendant thereafter pleaded guilty to the charge set forth in the part B information. The court rendered judgment accordingly and sentenced the defendant to a total effective sentence of seven years incarceration, followed by three years of special parole. From that judgment, the defendant now appeals.

I

The defendant first claims that the court improperly declined to furnish a jury instruction on the defense of personal property with respect to the assault count. In response, the state submits that the defendant both failed to preserve and impliedly waived that claim at trial. We agree with the state.

The following additional facts are relevant to the defendant's claim. On the first day of trial, the defendant filed a one page request to charge with the court.[5] On the second day of trial, the court noted for the record that it had received the defendant's request to charge. The court then stated: "[W]hat I would like to do is try to have a discussion about this. I think it would be easiest to start it in chambers so that I can give you copies [of the court's draft charge], and then come out here and summarize on the record what we have done and what we discussed in chambers. Because if it gets to a point where we could do closing arguments tomorrow, I very much would like to do closing arguments tomorrow." The court indicated that it would "take about forty-five minutes to preliminarily discuss the jury charge with the attorneys" in chambers during an afternoon recess.

When that recess concluded, the court explained to the jury: "[W]e've had the opportunity to have a preliminary discussion on the jury charge. And I have given to each attorney a very rough draft of what I call my overinclusive jury charge. I intend to take out the areas

that do not apply in this case, and then to also work further on the charges with respect to the crimes that are alleged in this case. And I intend to send this out via e-mail tonight to the two attorneys so that you will have that for review tonight. *I am going to grant the defendant's request to charge the jury on defense of personal property. I will put that in there.* And [if the prosecutor has] any objections to it, you can do that formally tomorrow on the record." (Emphasis added.)

The record before us contains a copy of the draft charge that the court provided to the parties later that night.[6] That charge states in relevant part: "The evidence in this case raises the issue of the use of force against another to defend personal property. This defense applies to the charge of [r]obbery in the [f]irst [d]egree." The draft charge did not indicate that the defense applied to either the assault or the criminal violation of a protective order counts.

The next day, the court held a charge conference with the parties following the close of evidence. At the outset, the court indicated that it had sent a copy of its revised draft charge to the parties the previous night and inquired whether they had reviewed it; defense counsel answered affirmatively. The court also noted that "the defense did ask yesterday in chambers . . . for a lesser included [offense] of assault in the third degree on the assault second, so I have included that. . . . *And the defense also asked for the self-defense under the defense of [personal] property, which is included as well.*" (Emphasis added.) The court then asked if the parties had sufficient time to review the court's proposed charge to the jury and solicited feedback thereon, at which time defense counsel asked the court to change the word "statement" to "statements" in a section on impeachment evidence because the defendant was claiming that multiple inconsistent statements had been made. After agreeing to that change, the court asked: "Anything else?" Defense counsel replied, "No, Your Honor. . . . I'm all set, Your Honor. Thank you." The court then stated: "All right. And you both have had enough time with the charge that you feel comfortable with the court charging [the jury] today?" Both parties answered, "Yes, Your Honor." The court then adjourned the proceeding for a midday recess.

When that recess concluded, the court stated for the record that it had "sent both parties a copy of the final jury instruction in electronic form." The court then permitted the parties to make closing arguments. In his closing argument, defense counsel stated in relevant part that the defense of personal property "is a complete defense to robbery in the first degree." Counsel did not reference that defense in his discussion of either the assault or the criminal violation of a protective order offenses.

Following closing arguments, the court provided its

charge to the jury. With respect to the defense of personal property, the court instructed the jury that this defense applied to the robbery charge.[7] When it concluded, the court asked the parties if they had any objections. At that time, defense counsel stated, "No objections, Your Honor, at all."

On appeal, the defendant claims that the court "improperly instructed the jury that the defense of [personal] property only applied to the robbery charge." He argues that, on the basis of his request to charge, the court should have instructed the jury that the defense applied to the robbery and assault charges set forth in counts one and two of the information, but not to the criminal violation of a protective order charge contained in count three. The court's failure to do so, he contends, violated his constitutional rights to due process and to present a defense.

Before we can consider the merits of that claim, we must resolve two threshold issues. Specifically, we must determine whether the defendant properly preserved that claim with the trial court. If that claim was not properly preserved, we also must determine whether the doctrine of implied waiver precludes further review.

A

We begin by noting the fundamental precept, deeply ingrained in our decisional law and our rules of practice, that the appellate courts of this state "shall not be bound to consider a claim unless it was distinctly raised at the trial . . . ."[8] (Internal quotation marks omitted.) *Ulbrich* v. *Groth*, 310 Conn. 375, 427, 78 A.3d 76 (2013); see also Practice Book § 42-16 (party taking exception to court's instruction "shall state distinctly the matter objected to and the ground of exception"); Practice Book § 60-5 (party obligated to distinctly raise claim before trial court to be entitled to appellate review); *State* v. *King*, 289 Conn. 496, 505–506, 958 A.2d 731 (2008) (preservation requirement applies to challenges to jury instructions); *Lee* v. *Stanziale*, 161 Conn. App. 525, 538, 128 A.3d 579 (requirement that party distinctly raise claim of error before trial court "a prerequisite to appellate review"), cert. denied, 320 Conn. 915, 131 A.3d 750 (2015); *State* v. *Nieves*, 106 Conn. App. 40, 55, 941 A.2d 358 (requirement that party distinctly raise claim applies to jury instruction challenge), cert. denied, 286 Conn. 922, 949 A.2d 482 (2008). "The requirement that the claim be raised distinctly means that it must be so stated as to bring to the attention of the court the *precise* matter on which its decision is being asked. . . . [It must] alert the trial court to the specific deficiency now claimed on appeal." (Citation omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Carter*, 198 Conn. 386, 396, 503 A.2d 576 (1986).

Requiring a party to distinctly raise a claim of error before the trial court is no mere formality; rather, it

ensures that the trial court is specifically apprised of the alleged error and, thus, has an opportunity to respond accordingly. "As [our Supreme Court] repeatedly has observed, the essence of the preservation requirement is that fair notice be given to the trial court of the party's view of the governing law . . . . A secondary purpose of the preservation requirement is to prevent the possibility that an appellee would be lured into a course of conduct at the trial which it might have altered if it had any inkling that the [appellant] would . . . claim that such a course of conduct involved rulings which were erroneous and prejudicial to him. . . . Assigning error to a court's . . . rulings on the basis of objections never raised at trial unfairly subjects the court and the opposing party to trial by ambush." (Citations omitted; internal quotation marks omitted.) *State* v. *Benedict*, 313 Conn. 494, 505–506, 98 A.3d 42 (2014); accord *State* v. *Jorge P.*, 308 Conn. 740, 753, 66 A.3d 869 (2013) ("the sina qua non of preservation is fair notice to the trial court"). Through that lens must an appellate body view claims of error on the part of the trial court.

In the context of jury instructions, a party "may preserve for appeal a claim that an instruction . . . was . . . defective either by: (1) submitting a written request to charge covering the matter; or (2) taking an exception to the charge as given." (Internal quotation marks omitted.) *State* v. *King*, supra, 289 Conn. 505; see also Practice Book § 42-16. The defendant in the present case filed a written request to charge. See footnote 5 of this opinion. The question, then, is whether that request sufficiently covered the matter so as to preserve the issue for appellate review. Put differently, the relevant inquiry is whether the defendant's request to charge alerted the trial court to the specific deficiency now claimed on appeal. See *State* v. *Carter*, supra, 198 Conn. 396.

We conclude that it did not. The distinct claim presented on appeal concerns the failure of the trial court to provide a defense of personal property instruction to the jury with respect to two of the three counts alleged in the operative information—namely, the robbery and assault counts, but not the criminal violation of a protective order count. On its face, the defendant's written request to charge is patently deficient in this regard, as it does not alert the trial court to such a request. The substance of that one page request merely communicated (1) the defendant's desire to have the court provide a defense of personal property instruction to the jury and (2) the defendant's belief that "[t]he evidence supports this request." As a result, the defendant's request is inherently ambiguous, in that it is unclear whether the defendant sought such an instruction as to only one of the charged offenses, all of the charged offenses, or some combination thereof.

As our Supreme Court has explained, "the submission

of a request to charge covering the matter at issue preserves a claim that the trial court improperly failed to give an instruction on that matter. . . . In [such] instances, the trial court has been put on notice and afforded a timely opportunity to remedy the error. . . . It does not follow, however, that a request to charge addressed to the subject matter generally, but which *omits* an instruction on a specific component, preserves a claim that the trial court's instruction regarding that component was defective." (Citations omitted; emphasis in original.) *State* v. *Ramos*, 261 Conn. 156, 170–71, 801 A.2d 788 (2002), overruled in part on other grounds by *State* v. *Elson*, 311 Conn. 726, 754–55, 91 A.3d 862 (2014). A defendant's failure to distinctly raise an instructional claim in its written request to charge or to otherwise take an exception to the court's instruction renders that particular claim unpreserved for appellate review. See id., 171; see also *State* v. *Tozier*, 136 Conn. App. 731, 743, 46 A.3d 960 ("[t]he defendant did not preserve this claim for appellate review as he did not . . . distinctly raise these arguments [regarding instructional error] before the trial court"), cert. denied, 307 Conn. 925, 55 A.3d 567 (2012); *State* v. *Joseph*, 110 Conn. App. 454, 459–60, 955 A.2d 124 (because defendant's written request to charge contained general credibility instruction but did not distinctly raise issue of accomplice credibility, trial court "was not put on notice" of that issue, rendering it unpreserved), cert. denied, 289 Conn. 945, 959 A.2d 1010 (2008); *Abdelsayed* v. *Narumanchi*, 39 Conn. App. 778, 785, 668 A.2d 378 (1995) ("[W]hile the defendant did prepare a written request to charge, that proposed charge did not distinctly address the issue the defendant now raises. We, therefore, do not address his claim on appeal. [Footnote omitted.]"), cert. denied, 237 Conn. 915, 676 A.2d 397, cert. denied, 519 U.S. 868, 117 S. Ct. 180, 136 L. Ed. 2d 120 (1996); id., 785 n.1 (concluding that "these words [contained in the defendant's request to charge] did not sufficiently afford notice to the trial court as to the claimed error the defendant now raises"); contra *Benanti* v. *Delaware Ins. Co.*, 86 Conn. 15, 21, 84 A. 109 (1912) ("[t]he issue of misrepresentation of title . . . was distinctly presented in the defendant's requests to charge"); cf. *State* v. *Jones*, 289 Conn. 742, 760, 961 A.2d 322 (2008) ("when the trial court failed to instruct the jury as the defendant had requested, defense counsel objected two different times, thus effectively preserving the issue for appellate review even if his written request to charge was ambiguous").

The defendant claims that *State* v. *Ramos*, 271 Conn. 785, 860 A.2d 249 (2004), is "controlling" on the question of preservation. We do not agree. In that case, only two counts remained following the close of evidence: assault in the second degree in violation of § 53a-60 (a) (2) and carrying a weapon in a motor vehicle in violation of General Statutes (Rev. to 1997) § 29-38. Id., 790. At

trial, the defendant "requested that the trial court instruct the jury on the affirmative defense of self-defense but did not specify the count or counts of the information to which the defense applied. The trial court gave a self-defense instruction with respect to the assault charge, but . . . instructed the jury that self-defense was not a defense to the charge under § 29-38." Id., 800. On appeal, the defendant claimed that "the trial court improperly instructed the jury that the defense of self-defense did not apply to a charge under § 29-38." Id., 799. Our Supreme Court concluded that the defendant's claim was preserved for appellate review, stating: "Although we agree with the state that the record leaves some doubt as to whether the defendant's general request to charge was adequate to place the trial court on notice that he believed that the claim of self-defense applied to both charges, we read the failure to specify as an indication that it applied to both charges and that the claim was, therefore, preserved for review." Id., 801.

For two reasons, *Ramos* is readily distinguishable from the present case. First, as a factual matter, the defendant here is not arguing that his general request to charge on the defense of personal property should have been applied to *all* pending counts, as was the case in *Ramos*.[9] Rather, the defendant maintains that the court should have provided that instruction with respect to two of the three counts levied against him by the state and improperly furnished such an instruction as to only one of those counts.

Second, as a procedural matter, the defendant overlooks the critical fact that, in *Ramos*, the state had filed "a supplemental request to charge" in response to the defendant's request to charge, in which the state maintained that "self-defense was not a defense to the charge under § 29-38." Id., 800. By so doing, the state alerted the court to the distinct issue of whether that defense so applied, rendering that issue properly preserved for appellate review. It nonetheless remains that the state in the present case neither filed a request to charge regarding the applicability of the defense of personal property to an assault charge nor otherwise raised that issue in any manner before the trial court. *Ramos*, therefore, is both factually and procedurally inapposite to the present case.

Similarly misplaced is the defendant's reliance on *State* v. *Paige*, 304 Conn. 426, 40 A.3d 279 (2012). In *Paige*, both the defendant *and* the state submitted requests to charge on the disputed instruction. Id., 439. Moreover, the trial court held a charging conference, at which it heard argument from the parties on that instructional issue. Id. With "the specific circumstances of the present case in mind," our Supreme Court ultimately concluded that the issue was preserved for appellate review, noting that "[w]e never have required

. . . a defendant who has submitted a request to charge also to take an exception to a *contrary* charge . . . ." (Emphasis added.) Id., 442–43. Significantly, the state, in both *Paige* and *Ramos*, requested an alternative instruction that was contrary to the one requested by the defendant. As a result, the trial court in those cases plainly was apprised of the distinct instructional issue, obviating the need for the defendant to further memorialize his objection to the court's charge. No such contrary request was made by the state in the present case.

The defendant's reliance on *State* v. *Johnson*, 316 Conn. 45, 111 A.3d 436 (2015), also is unavailing. In that case, the defendant filed a written request to charge that proposed specific language on the issues of constructive and nonexclusive possession. Id., 52. In both its draft charge and the final charge that it provided to the jury, the trial court declined to include all of the language requested by the defendant; instead, the court "selectively omitted certain paragraphs [specifically requested by the defendant] altogether." Id., 55–56. Furthermore, "[t]here was never any discussion relating to this charge or this element of the offenses." Id., 56. In such circumstances, our Supreme Court held that the defendant was not obligated to raise a further objection to the court's charge to preserve the issue for appeal because "[t]he defendant reasonably could have interpreted the trial court's selective adoption of parts of her possession instruction as a purposeful rejection of the omitted language. . . . [T]he defendant was not required to object to the truncated instruction to preserve her request for the more comprehensive instruction." Id. As in *Paige* and *Ramos*, the trial court in *Johnson* was specifically alerted to the distinct instructional deficiency later pursued on appeal.

The facts of the present case are markedly different. Neither the defendant's written request to charge nor anything else in the record before us indicates that the defendant ever alerted the court to the distinct instructional deficiency he now alleges on appeal. At no time did the defendant apprise the court of his desire to have the court furnish a defense of personal property instruction with respect to counts one and two, but not count three, of the information. Rather, the record before us indicates that (1) the defendant generally requested a defense of personal property instruction without specifying its alleged applicability to any particular counts; (2) the court discussed that request with both parties during an in-chambers conference on May 17, 2016, and then agreed on the record to provide a defense of personal property instruction to the jury;[10] (3) at that time, the court stated that it would entertain any objections to that instruction at the charge conference the next day; (4) the court then included an instruction on the defense of personal property with respect to the robbery count in the draft charge that it provided to the parties; and (5) the court also included that

instruction in both the revised charge that it "sent [to the] parties . . . in electronic form" and the final charge that it ultimately delivered to the jury. At no time did the defendant notify the court of any issue or disagreement with the court's instruction despite several opportunities to do so. Rather, defense counsel affirmatively indicated that he was "all set."

Accordingly, we cannot conclude on the particular facts of this case that the instruction provided by the court was "contrary" to that submitted by the defendant in his written request to charge. See *State* v. *Paige*, supra, 304 Conn. 443 (defendant who has submitted request to charge not required "to take an exception to a contrary charge"). The record indicates that the defendant asked for an instruction on the defense of personal property and that the court, after discussing the matter with the parties, granted the defendant's request and provided such an instruction. At the same time, the record does not reflect that the trial court ever was "on notice of the purported defect" that the defendant now advances on appeal. *State* v. *Thomas W.*, 301 Conn. 724, 736, 22 A.3d 1242 (2011).

Our law requires a party pursuing a claim of instructional error "to bring to the attention of the [trial] court the *precise* matter on which its decision is being asked" so as to "alert the trial court to the specific deficiency now claimed on appeal." (Citation omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Carter*, supra, 198 Conn. 396. The defendant failed to do so in his written request to charge. Furthermore, despite ample opportunity, the defendant raised no such objection to the court's instruction at any time. Accordingly, we conclude that his claim of instructional error was not properly preserved for appellate review.

B

Having determined that the defendant failed to alert the trial court to the distinct claim of instructional error presented in this appeal, we next consider whether the doctrine of implied waiver precludes substantive review. Whether a defendant has waived the right to challenge the court's jury instructions involves a question of law, over which our review is plenary. *State* v. *Davis*, 311 Conn. 468, 477, 88 A.3d 445 (2014).

Our analysis begins with the seminal decision of *State* v. *Kitchens*, 299 Conn. 447, 10 A.3d 942 (2011), in which our Supreme Court "established a framework under which we review claims of waiver of instructional error . . . ." *State* v. *McClain*, 324 Conn. 802, 810, 155 A.3d 209 (2017). In *Kitchens*, the court emphasized that waiver involves the idea of assent; *State* v. *Kitchens*, supra, 469; and explained that implied waiver occurs when a defendant "had sufficient *notice* of, and accepted, the instruction" proposed or given by the trial court. (Emphasis in original.) Id., 487 n.25. More

specifically, the court held that "when the trial court provides counsel with a copy of the proposed jury instructions, allows a meaningful opportunity for their review, solicits comments from counsel regarding changes or modifications and counsel affirmatively accepts the instructions proposed or given, the defendant may be deemed to have knowledge of any potential flaws therein and to have waived implicitly the constitutional right to challenge the instructions on direct appeal." Id., 482–83. The court further explained that "[s]uch a determination by the reviewing court must be based on a close examination of the record and the particular facts and circumstances of each case."[11] Id., 483; see also *State* v. *Bellamy*, 323 Conn. 400, 426, 147 A.3d 655 (2016) ("reviewing courts are required to determine whether the unique facts and circumstances in any given case support a finding of waiver").

In the present case, the trial court conducted a preliminary charge conference with the parties in chambers following the filing of the defendant's request to charge. When that conference concluded, the court indicated that it had provided the parties with "a very rough draft" of its jury charge, which it further refined later that day. The court also stated that it was "going to grant the defendant's request to charge the jury on defense of personal property. I will put that in there." The court then sent the parties a revised version of its draft charge that night, which included an instruction that the defense of personal property was a defense to the charge of robbery in the first degree.

The next day, the court held another charge conference, at which defense counsel confirmed that he had received the court's revised draft charge. The court at that time solicited comments from the parties regarding changes or modifications, and defense counsel asked the court to make a linguistic change to a section of the charge regarding impeachment evidence, which the court agreed to do. The court then asked: "Anything else?" Defense counsel replied, "No, Your Honor. . . . I'm all set, Your Honor. Thank you." The court then stated: "All right. And you both have had enough time with the charge that you feel comfortable with the court charging [the jury] today?" Defense counsel answered, "Yes, Your Honor."

Later that day, the court noted for the record that it had "sent both parties a copy of the final jury instruction in electronic form." The court then permitted the parties to make closing arguments. In his closing argument, defense counsel stated in relevant part that defense of personal property "is a complete defense to robbery in the first degree." Counsel did not reference that defense in his discussion of either the assault or the criminal violation of a protective order offenses. Furthermore, in its subsequent charge, the court instructed the jury that the defense of personal property applied to the

robbery charge. When it concluded, the court asked the parties if they had any objections; defense counsel responded, "No objections, Your Honor, at all."

The facts and circumstances of this case largely resemble those chronicled in *State* v. *Thomas W.*, supra, 301 Conn. 724. As our Supreme Court stated: "[T]he following undisputed facts . . . establish an implied waiver under the *Kitchens* standard. The trial court conducted a charging conference, provided copies of the proposed charge to the defendant and elicited input from him. The defendant asked for an addition to the charge, and the court complied with that request. . . . [T]he defendant . . . conceded . . . that he had been given sufficient time to review [the court's draft charge]. . . . The defendant twice expressed satisfaction with the charge when asked by the court—before and after the charge was given." (Citations omitted.) Id., 734–35.

Here, a close examination of record reveals that the defendant was provided with a meaningful opportunity to review the court's initial draft charge that the court provided during the in-chambers conference, the revised draft charge that the court sent to the parties later that night, and the final draft charge that the court provided prior to closing arguments. The court solicited and received comments from the parties over the course of multiple charge conferences. The defendant thereafter expressed satisfaction with both the draft charge that the court provided to the parties and the ultimate charge that the court delivered to the jury. Moreover, at no time at trial did the defendant voice any objection regarding the instructional deficiency he now alleges on appeal.[12] In light of those undisputed facts, we conclude that the doctrine of implied waiver precludes substantive consideration of the defendant's claim of instructional impropriety.[13] See *State* v. *Kitchens*, supra, 299 Conn. 482–83.

II

The defendant also claims that prosecutorial impropriety during closing argument deprived him of a fair trial. We disagree.

The following facts are relevant to this claim. At trial, the victim testified that the defendant placed phone calls and sent her text messages from a phone belonging to his mother. See footnote 1 of this opinion. In his testimony, Burrus stated that he had reviewed certain text messages sent to the victim from that phone. On cross-examination, defense counsel asked Burrus if he would "agree that if we had the cell phone records here, or the text phone messages here, that would be a much more reliable source of information"; Burris answered affirmatively. When the defendant testified the next day, the prosecutor asked him whether he spoke with Burrus on the night of the altercation, to which the defendant replied: "I never spoke with him. You should have got

the phone records. I was asking for them. I never spoke with him."

Prior to closing arguments, the court advised the jury that the arguments of counsel "are not evidence" but, rather, were an "opportunity to go over the evidence that's been presented [to] you . . . ." The prosecutor then began her initial closing argument by urging the jurors as follows: "[I]f there's anything that I say during my oral argument to you and your recollection of the testimony or the evidence differs from my recollection, you follow your recollection, not mine, okay? So, I just want to make that very clear right from the get go." The prosecutor then discussed various aspects of the evidence presented at trial.

In his closing argument, defense counsel repeatedly reminded the jurors that the state had not presented evidence of the cell phone records. With respect to certain discrepancies between the respective testimony of the victim and the defendant, counsel stated: "This issue could have been simply solved by giving you the cell phone records, subpoena the Verizon records or whoever the carrier is, bring those in, show you guys those, show them to me, show them to the judge, those are indisputable. Remember that it is always the state's burden of proof." Defense counsel later remarked: "As I've said over and over again, I said this several times during the course of the case, there's no info from that cell phone. It could have been downloaded and presented to you on a big screen, shown to me and shown to you. That would be solid evidence. We don't have it. I don't have it. You don't have it." After acknowledging that the victim sustained physical injuries on the night in question, defense counsel again noted the lack of evidence presented by the state, arguing: "I'm going to say it again, no cell phone records, there's no text messages to show you, there's no forensic evidence in this case . . . ."

During her rebuttal argument, the prosecutor responded to that line of argument by defense counsel, stating in relevant part: "Counsel also stated the fact that there were no cell phone records. Well, cell phone records, is he referring to the cell phone records of [the defendant's mother] or [the victim's] cell phone records? What would those records have said, had told us? I submit those records probably would have helped me. Counsel points that out to you about the cell phone records." Defense counsel did not object at the time that the prosecutor made that statement.

The next morning, defense counsel alerted the court to a concern about the prosecutor's statement, and the following colloquy ensued:

"[Defense Counsel]: I'm thinking more about the closing that the [prosecutor] did. She made a comment which was, I submit that the cell phone records would

have . . . probably helped her. I don't think that that's a proper statement. . . . So, I would ask that the jury be instructed that the comment was not a proper one.

"The Court: All right. Any objection to that?

"[The Prosecutor]: Judge, it was inadvertent.

"The Court: Okay. . . .

"[The Prosecutor]: —and if the court feels at all that it was improper, I have no objection to any curative instruction the court wishes to give.

"The Court: All right. I mean, inadvertence happens, but I think it is important to reiterate to the jury that evidence is only what was before them, and I will specifically address this. Now—

"[Defense Counsel]: Thank you, and I agree with the state, it was completely an inadvertent thing.

"The Court: Okay. That's fine.

"[The Prosecutor]: Thank you, counsel."

The jury then reentered the courtroom, at which time the court provided a curative instruction advising it to disregard the prosecutor's statement from the previous day.[14]

On appeal, the defendant maintains that the prosecutor's statement that "those [cell phone] records probably would have helped me" was improper commentary on facts not in evidence, which deprived him of a fair trial. The state concedes, and we agree, that the prosecutor's statement was improper. The state nonetheless contends that it did not amount to a denial of the defendant's right to a fair trial.

"In analyzing claims of prosecutorial impropriety, we engage in a two step analytical process. . . . The two steps are separate and distinct. . . . We first examine whether prosecutorial impropriety occurred. . . . Second, if an impropriety exists, we then examine whether it deprived the defendant of his due process right to a fair trial. . . . In other words, an impropriety is an impropriety, regardless of its ultimate effect on the fairness of the trial. Whether that impropriety was harmful and thus caused or contributed to a due process violation involves a separate and distinct inquiry." (Internal quotation marks omitted.) *State* v. *Campbell*, 328 Conn. 444, 541–42, 180 A.3d 882 (2018). Only the second step of that analysis is at issue in the present case.

To determine whether the prosecutor's improper argument deprived the defendant of his due process right to a fair trial, "we are guided by the factors enumerated . . . in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987). These factors include the extent to which the [impropriety] was invited by defense conduct or argument, the severity of the [impropriety], the frequency of the [impropriety], the centrality of the [impro-

priety] to the critical issues in the case, the strength of the curative measures adopted, and the strength of the state's case." (Internal quotation marks omitted.) *State* v. *Martinez*, 319 Conn. 712, 736, 127 A.3d 164 (2015).

We first consider the frequency and the severity of the challenged remarks. As defense counsel conceded at trial, the prosecutorial impropriety at issue consisted of a single, inadvertent statement. The prosecutor made no mention of cell phone records in her initial closing argument and made only one isolated reference in her rebuttal argument. The comment also was not particularly severe, as it consisted of a brief suggestion that any cell phone records "probably would have helped" the state's case. In this regard, we note that defense counsel did not object to the prosecutor's statement at the time that it was made. See *State* v. *Grant*, 154 Conn. App. 293, 328, 112 A.3d 175 (2014) ("defense counsel's failure to make a contemporaneous objection . . . permits an inference that counsel did not think the impropriety was severe"), cert. denied, 315 Conn. 928, 109 A.3d 923 (2015). Furthermore, "the severity of the impropriety is often counterbalanced in part" by the infrequency of the impropriety. (Internal quotation marks omitted.) *State* v. *Daniel W.*, 180 Conn. App. 76, 113, 182 A.3d 665, cert. denied, 328 Conn. 929, 182 A.3d 638 (2018). The infrequency of the prosecutorial impropriety in the present case is undisputed.

In addition, the prosecutor's improper comment was not central to the critical issues in the case, as the existence of cell phone records had little bearing on the question of whether the defendant perpetrated the charged offenses. Although the defendant argues in his reply brief that "[t]he impropriety went directly to" his conviction for violating a protective order, the basis of that charge stemmed not from the defendant's phone calls or text messages to the victim but, rather, his confrontation with her as she walked home. In the long form information, the state specifically alleged that "on or about March 23, 2013, at approximately 2:45 [a.m.] in the area of 50 Kensington Avenue . . . [the defendant] violated a protective order when he made contact with [the victim] and assaulted her by repeatedly kicking her . . . ." At trial, the defendant admitted in his testimony that he confronted the victim as she was walking home. Moreover, Burrus testified that he spoke with the defendant soon after the altercation transpired, at which time the defendant acknowledged that "he came to the area [of the altercation] and that he had confronted" the victim. On the basis of that testimony, the jury reasonably could have concluded that the defendant violated the terms of the protective order. We therefore disagree with the defendant that the prosecutor's improper comment about cell phone records was central to the critical issues in the case.

The prosecutor's improper comment also appears to

have been invited by the defendant's testimony at trial. On cross-examination, the defendant denied speaking with Burrus shortly after the altercation, stating: "I never spoke with him. You should have got the phone records. I was asking for them. I never spoke with him." To the extent that the defendant in his testimony suggested that the cell phone records would have corroborated his trial testimony, he invited the prosecutor's improper comment to the contrary.

With respect to his conviction of criminal violation of a protective order and assault in the third degree, the state's case was strong. In his testimony, the defendant admitted that he made contact with the victim as she walked home on the night in question. Although the victim and the defendant provided differing accounts of the altercation, the jury also heard testimony from Martinez, who witnessed the incident and corroborated the victim's account. Contrary to the defendant's testimony at trial that he "didn't touch her," Martinez told the jury that he saw "a male beating up a female . . . . I saw some kicking. I saw her on the ground, and I saw someone—the male, you know, really giving it to her, stomping on her." The state's case also included testimony from Burrus, who responded to the scene and observed the victim's physical and emotional state, as well as photographs later taken at the hospital, which depict in graphic fashion the injuries to the victim's face, neck, hands, and back.

Lastly, the trial court provided a curative instruction in response to a concern raised by defense counsel the day after closing arguments concluded. In that directive, the court instructed jurors that "you should not consider" the prosecutor's improper statement, as it was not supported by evidence in the record. See footnote 14 of this opinion. In the absence of an indication to the contrary, we presume that the jury followed that curative instruction. See *State* v. *Camacho*, 282 Conn. 328, 385, 924 A.2d 99, cert. denied, 552 U.S. 956, 128 S. Ct. 388, 169 L. Ed. 2d 273 (2007).

Having considered the foregoing factors in light of the record before us, we conclude that the prosecutor's improper comment did not so infect "the trial with unfairness as to make the resulting conviction a denial of due process." (Internal quotation marks omitted.) *State* v. *Williams*, supra, 204 Conn. 539. The defendant's prosecutorial impropriety claim, therefore, fails.

The judgment is affirmed.

In this opinion the other judges concurred.

* In accordance with our policy of protecting the privacy interest of the victim of a criminal violation of a protective order, we decline to identify the victim or others through whom the victim's identity may be ascertained.

[1] At trial, the victim testified that because the defendant's cell phone was broken, he often called or texted her from a phone belonging to his mother, Maria. For that reason, she would receive incoming calls or text messages from him under a contact labeled "Maria." In her testimony, the victim indicated that all relevant phone calls or text messages received from the

defendant were from that contact.

[2] An audio recording of that 911 call was admitted into evidence.

[3] At trial, Burrus confirmed that he knew the defendant and had spoken with him prior to the night in question. Burrus testified that he knew the defendant by the nickname "Cito" and also knew the defendant's mother and brother. Burrus explained that he had "dealt with [the defendant] on other calls [in the course of his] duties as a police officer, and prior to that [knew him] as a teenager," as the defendant was a friend of Burrus' brother-in-law.

[4] Burrus testified that the text messages were from a contact labeled "Maria." See footnote 1 of this opinion.

[5] The defendant's written request to charge states in full: "Defendant moves this court, pursuant to [Practice Book] § 42-16 et seq. and the [s]ixth and [f]ourteenth [a]mendments to the United States [c]onstitution, to give Jury Instruction 2.8-5, Defense of Personal Property ([General Statutes] § 53a-21). The evidence supports this request. Wherefore, for the reasons set forth above, together with such other reasons as may be advanced in any memorandum of law submitted and/or hearing conducted in connection herewith, [the defendant] respectfully prays that the [c]ourt adopt this proposed instruction." The defendant did not submit a memorandum of law on that request.

[6] Following the commencement of this appeal, the state filed a motion for rectification, in which it asked the trial court to supplement the record with a copy of the draft charge. The court granted that request on January 29, 2018.

[7] The court instructed the jury in relevant part: "The evidence in this case raises the issue of the use of force against another to defend personal property. This defense applies to the charge of robbery in the first degree. After you have considered all the evidence in this case on the charge of robbery in the first degree, if you find that the state has proved each element beyond a reasonable doubt, then you must go on to consider whether or not the defendant acted justifiably in the defense of personal property. In this case you must consider this defense in connection with count one of the information."

[8] As our Supreme Court explained nearly two centuries ago: "It has been repeatedly decided, by us, that . . . we will not allow points of law to be discussed, which were not made, or which were waived, in the court below. We adhere to these decisions. The rule which they establish, is a salutary one, essential to the preservation of the rights of parties, and to the due administration of justice." *Torry* v. *Holmes*, 10 Conn. 499, 507 (1835).

[9] As the defendant acknowledges in his reply brief, his "trial counsel's theory of defense of property did not pertain to the protective order charge."

[10] Following the in-chambers conference with the parties, the court stated: "I am going to grant the defendant's request to charge the jury on defense of personal property. I will put that in there."

[11] Our Supreme Court has since reaffirmed the vitality of the waiver rule enunciated in *Kitchens* and expressly rejected the claim that it "should be overturned because it is confusing, unworkable, interferes with an appellate court's discretion to review unpreserved claims and does not serve the interests of justice." *State* v. *Bellamy*, 323 Conn. 400, 403, 147 A.3d 655 (2016).

[12] In his principal appellate brief, the defendant also suggests that he preserved his objection by moving for a judgment of acquittal at his sentencing hearing months after his trial concluded. He has provided no legal authority in support of that contention. To the contrary, our Supreme Court has held that posttrial motions do not properly preserve a claim that the court's charge to the jury improperly omitted an appropriate instruction. See *Oakes* v. *New England Dairies, Inc.*, 219 Conn. 1, 8, 591 A.2d 1261 (1991); see also *State* v. *Santiago*, 142 Conn. App. 582, 602 n.17, 64 A.3d 832 (declining to address claim raised "for the first time at [the defendant's] posttrial sentencing hearing"), cert. denied, 309 Conn. 911, 69 A.3d 307 (2013).

[13] In his reply brief, the defendant also requests review pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). In *Kitchens*, our Supreme Court explained that the doctrine of implied waiver, when applicable, bars recourse under *Golding*, as "[a] constitutional claim that has been waived does not satisfy [its] third prong . . . because, in such circumstances, we simply cannot conclude that injustice [has been] done to either party . . . or that the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial . . . ." (Internal quotation marks omitted.) *State* v. *Kitchens*, supra, 299 Conn. 467; see also *State* v. *McClain*,

supra, 324 Conn. 808–809. Our determination that the defendant impliedly waived his instructional claim thus forecloses relief under *Golding*.

[14] The court instructed the jury as follows: "[Y]esterday during closing argument, [the prosecutor], in addressing the cell phone records, made a comment where she said, I submit to you that if the cell phone records had been here they would have been favorable to the state. Now remember that I told you that the only evidence that you can decide the case upon is evidence that has been presented to you in court and there was no evidence presented to that so that was an argument of counsel that there is no evidence to support that so you should not consider that statement. During the course of argument, people make inadvertent statements, and so I bring it to your attention just to let you know you did not receive evidence on that so I just want to tell you that." The defendant thereafter did not object to the curative instruction provided by the court.

---