STATE OF CONNECTICUT *v.* DANIEL SANTIAGO
(AC 20812)

Lavery, C. J., and Dranginis and McLachlan, Js.

Argued November 30, 2004—officially released March 8, 2005

*Darcy McGraw*, special public defender, for the appellant (defendant).

*James M. Ralls*, assistant state's attorney, with whom, on the brief, were *James E. Thomas*, state's attorney, and *Victor Carlucci, Jr.*, senior assistant state's attorney, for the appellee (state).

*Opinion*

DRANGINIS, J. This criminal appeal returns to this court on remand from our Supreme Court; *State* v. *Santiago*, 269 Conn. 726, 763, 850 A.2d 199 (2004); for resolution of the remaining claim of the defendant, Daniel Santiago. The defendant was convicted, following a

jury trial, of manslaughter in the first degree with a firearm in violation of General Statutes §§ 53a-55 (a) (1) and 53a-55a (a), and assault in the first degree in violation of General Statutes § 53a-59 (a) (1). The defendant claims that the trial court improperly instructed the jury on the issue of intent with respect to manslaughter in the first degree with a firearm, thereby depriving him of a fair trial. We disagree and, thus, affirm the judgment of the trial court.

The facts underlying the defendant's conviction were set out at length in *State* v. *Santiago*, 73 Conn. App. 205, 208–11, 807 A.2d 1048 (2002), rev'd in part, 269 Conn. 726, 850 A.2d 199 (2004). We will recite the facts, reasonably found by the jury, necessary to inform the issue on remand. "On November 26, 1997, the victim's brother, Craig Pitts, saw the victim, Barrett Applewhite, and the defendant having 'a few words' outside of an apartment building at 39 Wadsworth Street, Hartford. About one week earlier, Applewhite had 'fronted' the defendant cocaine to sell, and the defendant had agreed to pay Applewhite $500 after he sold the drugs. Although Pitts did not know what was said, the situation did not appear to him to be very serious, and Applewhite and the defendant soon went their separate ways. Afterward, Applewhite told Pitts that the defendant was 'crazy' and that he did not know what was wrong with him, but he did not give any details." Id., 208.

Later that evening, Applewhite was in the company of a number of people at 39 Wadsworth Street. At some point, some members of the group decided to go elsewhere and left in a sport utility vehicle being driven by Michael Ibscher. Applewhite was in the front passenger seat. After the vehicle pulled away, Applewhite received a cellular telephone call that they had forgotten someone. Ibscher backed the vehicle along the street to the front of 39 Wadsworth Street. Id., 208–209.

"At about that same time, the defendant . . . crossed Wadsworth Street and walked to the parked vehicle. He looked in the front passenger window directly at Applewhite and started 'talking junk,' saying, 'What? What?' Applewhite responded, 'What's your problem?' and asked why the defendant had approached the vehicle. Applewhite then said to the others, 'Let me see what's wrong with that [expletive].' Applewhite opened the door and stepped out of the vehicle to the sidewalk. He told the defendant that he was acting as if they had backed up the vehicle because of him, but that was not the case. He also told the defendant that they had no problem with him. The defendant, still facing Applewhite, moved toward the rear of the vehicle, saying, 'What? What?' Applewhite followed the defendant, reiterating that they had not backed up because of him and that he should leave.

"Ibscher, noticing that the defendant was 'agitated,' decided to join Applewhite to help prevent any problems. Ibscher exited the vehicle, walked to Applewhite and told him to relax, that it was a holiday and that they did not need any trouble. Neither he nor Applewhite were armed, and there were no weapons in the vehicle. Sensing that Applewhite would not advance on the defendant, but merely would discuss the matter with him, Ibscher moved a few feet behind Applewhite. The defendant, however, kept saying, 'What? What?' and appeared to be agitated, upset and dazed.

"At that time, Applewhite and the defendant were standing about eight to ten feet apart. Although neither Applewhite nor Ibscher moved toward the defendant, he suddenly pulled out a black automatic handgun from his sweatshirt pocket and began shooting at Applewhite because he saw Applewhite reach 'into his waist.' Applewhite immediately turned away from the defendant and started to run . . . but he was shot in the

back. Ibscher told the defendant that he was 'crazy,' and the defendant 'swiveled' toward Ibscher and shot him, hitting him in the leg as he was running through an alley . . . . In total, the defendant fired six or seven shots in rapid succession. After the defendant's automatic gun clicked twice, the defendant turned and ran . . . . " Id., 209–11. Applewhite died from his wounds. Id., 210 n.8.

Witnesses at the scene identified the defendant as the shooter, and police obtained a warrant for his arrest. Id., 211. The defendant turned himself in to the police on December 1, 1997, and gave them a statement in which he admitted to shooting Applewhite and Ibscher, but claimed that it was done in self-defense. Id., 211. The defendant was charged in a long form information with murder in violation of General Statutes § 53a-54a (a),[1] manslaughter in the first degree with a firearm in violation of §§ 53a-55 (a) (1)[2] and 53a-55a (a),[3] and assault in the first degree in violation of § 53a-59 (a) (1) and (5).[4]

---

[1] General Statutes § 53a-54a (a) provides in relevant part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person . . . ."

[2] General Statutes § 53a-55 (a) provides in relevant part: "A person is guilty of manslaughter in the first degree when: (1) With intent to cause serious physical injury to another person, he causes the death of such person or of a third person . . . ."

[3] General Statutes § 53a-55a (a) provides in relevant part: "A person is guilty of manslaughter in the first degree with a firearm when he commits manslaughter in the first degree as provided in section 53a-55, and in the commission of such offense he uses, or is armed with and threatens the use of or displays or represents by his words or conduct that he possesses a pistol, revolver, shotgun, machine gun, rifle or other firearm. . . ."

[4] General Statutes § 53a-59 (a) provides in relevant part: "A person is guilty of assault in the first degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument . . . or (5) with intent to cause physical injury to another person, he causes such injury to such person or to a third person by means of the discharge of a firearm."

In a part B information, the state also charged the defendant with the commission of a class A, B, or C felony with a firearm.

The jury found the defendant guilty of manslaughter in the first degree with a firearm and assault in the first degree. *State* v. *Santiago*, supra, 73 Conn. App. 211. Following the verdict, the court sentenced the defendant to a total effective term of sixty years imprisonment. Id. The defendant appealed to this court. This court reversed the judgment of conviction on the basis of the defendant's claim of prosecutorial misconduct.[5] Id., 212–31. Our Supreme Court granted the state's petition for certification to appeal; *State* v. *Santiago*, 262 Conn. 939, 815 A.2d 673 (2003); and subsequently reversed in part the judgment of this court and remanded the case to this court to consider the defendant's remaining claim of instructional error. *State* v. *Santiago*, supra, 269 Conn. 763. We asked the parties to submit supplemental briefs to address any new authority decided since the filing of their original briefs.

On appeal, the defendant claims that the trial court improperly instructed the jury regarding intent with respect to the charge of manslaughter in the first degree with a firearm. Specifically, the defendant claims that the court improperly instructed the jury on the statutory definition of intent and several times referred to that general language in a case in which the defendant was charged with specific intent crimes. We disagree with the defendant's claim.

"When reviewing a challenged jury instruction, [i]n appeals involving a constitutional question, [the standard is] whether it is reasonably possible that the jury

---

[5] "The defendant raised five claims in the Appellate Court. On the claim of prosecutorial misconduct, the Appellate Court reversed the judgment of the trial court and ordered a new trial. The Appellate Court addressed three additional claims because they were likely to arise on remand, but declined to reach the defendant's final claim, which challenged the trial court's instruction to the jury regarding intent with respect to the charge of manslaughter in the first degree with a firearm, because it was not likely to arise on remand. *State* v. *Santiago*, [supra, 73 Conn. App. 208]." *State* v. *Santiago*, supra, 269 Conn. 728 n.4.

[was] misled. . . . In determining whether it was . . . reasonably possible that the jury was misled . . . the charge to the jury is not to be critically dissected for the purpose of discovering possible inaccuracies of statement, but it is to be considered rather as to its probable effect upon the jury in guiding [it] to a correct verdict in the case. . . . The charge is to be read as a whole and individual instructions are not to be judged in artificial isolation from the overall charge. . . . The test to be applied . . . is whether the charge, considered as a whole, presents the case to the jury so that no injustice will result." (Citations omitted; internal quotation marks omitted.) *State* v. *DeBarros*, 58 Conn. App. 673, 682, 755 A.2d 303, cert. denied, 254 Conn. 931, 761 A.2d 756 (2000). "[A] request to charge which is relevant to the issues of [the] case and which is an accurate statement of the law must be given." (Internal quotation marks omitted.) Id., 690.

The relevant portions of the court's instruction to the jury follow. "We're now going to some of the elements of the offense. Intent. Intent relates to the condition of mind of the person who commits the act, his purpose in doing so. As defined by our statute, *a person acts intentionally with respect to a result or to conduct when his conscious objective is to cause such result or engage in such conduct.* Intentional conduct is purposeful conduct rather than conduct that is accidental or inadvertent. The existence of intent is a fact for the jury to determine. It must be proven beyond a reasonable doubt. What a person's purpose, intention or knowledge has been is usually a matter to be determined by inference. No person is able to testify that he looked into another's mind and saw therein a certain purpose or intention or a certain knowledge to do harm to another. The only way in which a jury can ordinarily determine what a person's purpose, intention or knowledge was at any given time, aside from that person's

own statement or testimony, is by *determining what that person's conduct was and what the circumstances were surrounding that conduct and from that infer what his purpose, intention or knowledge was.* To draw such an inference is not only the privilege, but also the proper function of a jury, provided, of course, that the inference drawn complies with the standards for inferences as explained in connection with my instruction on circumstantial evidence. *There will be further instructions concerning intent when I discuss the elements of the particular crimes. . . .*

"Now, turning to the specific crimes charged. Intentional murder under § 53a-54a (a). . . . A person is guilty of murder when, with the intent to cause the death of another person, he causes the death of such person. . . . [T]he state must prove the following elements beyond a reasonable doubt: One, that the defendant intended to cause the death of another person . . . . With respect to the charge of intentional murder, there is no particular length of time necessary for the defendant to have formed the specific intent to kill. . . . You will recall that I stated that what a person's purpose or intention has been is necessarily very largely a matter of inference. No person can be expected to testify that he looked into another person's mind and therein saw a certain purpose or intent. However, the jury may determine what a person's purpose or intent was at a given time by determining what the person's conduct was and what the circumstances were surrounding the conduct and, from these, infer what his purpose or intention was. . . .

"Intentional manslaughter in the first degree with a firearm. A person is guilty of the crime of manslaughter in the first degree with a firearm in violation of § 53a-55a (a) (1) of the Penal Code, which, insofar as is pertinent to this case, provides as follows. A person is guilty of manslaughter in the first degree when: (1) with intent

to cause serious physical injury to another person, he causes the death of such person. A person is guilty of manslaughter in the first degree with a firearm when he commits manslaughter in the first degree . . . and in the commission of such offense, he uses or is armed with or threatens the use of or displays or represents by his words or conduct that he possesses a pistol. For you to find the defendant guilty of this charge, the state must prove the following elements beyond a reasonable doubt: First, that the defendant caused the death of . . . Applewhite. The next element is that the *defendant intended to cause serious physical injury to . . .* Applewhite. The term serious physical injury means a physical injury that creates a substantial risk of death or that causes serious disfigurement, serious impairment of health or serious loss or impairment of the function of any bodily organ. *You will note that the basis of the charge under this statute is not that the defendant intended to kill, but that he intended to inflict serious physical injury. . . .*

"The intent instruction has already been given. Intent relates to the condition of mind of the person who commits the act, his purpose in doing it. As defined by our statute, a person acts intentionally with respect to a result or to conduct when his conscious objective is to cause such result or *engage in such conduct.* If you find that the state has proven beyond a reasonable doubt each of the elements of the crime, that is, *the defendant intended to cause serious physical injury and subsequently caused [the victim's] death with a firearm,* then you shall find the defendant guilty." (Emphasis added.)[6]

---

[6] The court also instructed the jury on the lesser included offenses of manslaughter in the first degree in violation of General Statutes § 53a-55 (a) (3) and manslaughter in the second degree with a firearm in violation of General Statutes § 53a-56a. The court defined recklessness for the jury: "A person acts recklessly with respect to a result or to a circumstance described by statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that such result will occur or

In this case, the defendant claims that it was improper for the court to instruct the jury with the statutory language of intent as found in General Statutes § 53a-3 (11). The court stated, "As defined by our statute, a person acts intentionally with respect to a result or to conduct when his conscious objective is to cause such result or engage in such conduct. Intentional conduct is purposeful conduct rather than conduct that is accidental or in advertent." Furthermore, the court charged: "The intent instruction has already been given. . . . As defined by our statute, a person acts intentionally with respect to a result or to conduct when his conscious objective is to cause such result or *engage in such conduct*." (Emphasis added.)

The defendant relies in part[7] on *State* v. *DeBarros*, supra, 58 Conn. App. 673, to support his contention, properly noting that "[i]t is improper for the trial court to read an entire statute to a jury when the pleadings or the evidence support a violation of only a portion

that circumstance exists. The risk must be of such nature and degree that disregarding it constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation. The standard of conduct of a reasonable person in the same situation as the defendant is the doing of something that a reasonable, prudent person would do under the circumstances or omitting to do what a reasonable, prudent person would not do under the circumstances."

[7] In his supplemental brief, the defendant also relies heavily on *State* v. *Sivak*, 84 Conn. App. 105, 852 A.2d 812, cert. denied, 271 Conn. 916, 859 A.2d 573 (2004). After reviewing the challenged portion of the instruction in *Sivak*, we conclude that it is distinguishable from the instruction challenged in this case.

The trial court in *Sivak* charged the jury in part: "In the first count, [which alleged a violation of General Statutes § 53a-59 (a) (1)], the state must prove that the defendant had the intent to cause serious physical injury, *had the intent to use a dangerous instrument*, and he caused serious physical injury and was not acting in self-defense." (Emphasis added; internal quotation marks omitted.) *State* v. *Sivak*, supra, 109. Here, the court did not charge the jury that it had to find that the defendant intended to use a dangerous instrument, the intended conduct at issue in *Sivak*. Moreover, the instructions challenged in *Sivak* included other misleading language relating to intent that is not at issue in this case.

of the statute . . . ." (Internal quotation marks omitted.) Id., 682. The defendant in *DeBarros* claimed that reading the jury the entire definition of intent set out in § 53a-3 (11) permitted the jury to find him guilty of specific intent crimes without necessarily finding that he intended to cause a specific result, but rather only that he intended to engage in conduct that caused a result. Id., 679. "The trial court not only improperly read the intent to 'engage in conduct' language in its initial and two supplemental charges, it also improperly referred back to that language seven times throughout its instructions to the jury. Under these circumstances, it does not strain reason to believe that the jury could have understood that the state needed to prove beyond a reasonable doubt only that the defendant intended to engage in the conduct of firing a gun, rather than prove on the charges of murder and attempt to commit murder that he intended to cause the death of the victim and [the victim's friend], and on the charge of assault in the first degree with a firearm that he intended to injure [the friend] seriously." Id., 683.

Although the court here twice used the statutory definition of intent in its charge, the number of errors the court makes is not the basis on which we decide whether the defendant was denied a fair trial. The key is whether, when the court's instruction is read as a whole, there is a reasonable probability that the jury will be misled. Our review of the jury instruction at issue is informed by *State* v. *Francis*, 246 Conn. 339, 358, 717 A.2d 696 (1998) (although court provided entire statutory definition of intent in instruction, it repeatedly instructed jury that to find defendant guilty of murder, jury had to conclude defendant intended to cause death of victim); *State* v. *Austin*, 244 Conn. 226, 237, 710 A.2d 732 (1998) (court distinguished between specific intent to cause death, required for conviction of murder, and specific intent to cause serious physical injury, neces-

sary for conviction of intentional manslaughter); and *State* v. *Prioleau*, 235 Conn. 274, 322, 664 A.2d 743 (1995) (court repeatedly instructed jury on specific intent necessary to be convicted of crime charged). As in *Austin*, the court here distinguished intent to murder and intent to cause serious physical injury in its charge.

In addition, the facts of a particular case may mitigate against the possibility of juror confusion. "A court's charge is not to be examined in a vacuum. Rather, it is to be viewed in the context of the factual issues raised at the trial." (Internal quotation marks omitted.) *State* v. *Austin*, supra, 244 Conn. 237. Here, the defendant admitted that he shot the victim in self-defense. The question before the jury therefore was what the defendant intended to do when he fired the gunshots. Under the circumstances, it strains reason to believe that the jury could not have understood that the court's instruction required the state to prove beyond a reasonable doubt that the defendant intended to cause serious physical injury to the victim. See *State* v. *Prioleau*, supra, 235 Conn. 322.

Furthermore, even if we were to assume that the court's reading of the statutory definition of intent rose to the level of a constitutional violation, which it did not, the instructional impropriety was harmless beyond a reasonable doubt; see *State* v. *Kirk R.*, 271 Conn. 499, 517, 857 A.2d 908 (2004); because the issue of whether the defendant intended to shoot was not in question. The jury acquitted the defendant of the more serious charge of murder. Clearly, the jury understood that it was to determine the defendant's mental state with respect to the crimes with which he was charged. Finally, the state's theory of the case was that the defendant lured Applewhite and Ibscher from the vehicle to shoot them. The defendant claimed that the victims pursued him and that he shot them in self-defense. The jury rejected the self-defense claim and accepted the

state's position that the defendant acted with specific intent to do harm.

The judgment is affirmed.

In this opinion the other judges concurred.